IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROMEO EDMUND, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-0087 |
| | § | |
| | § | |
| METROPOLITAN TRANSIT | § | |
| AUTHORITY OF HARRIS COUNTY, TX, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

The plaintiff, Romeo Edmund, sued his former employer, the Metropolitan Transit Authority of Harris County, Texas, in Texas state court. Edmund filed an EEOC complaint and then this suit after he was fired from his job as a bus operator. Edmund, who is African-American and from Nigeria, alleged discrimination on the basis of race and national origin, in violation of Title VII of the Civil Rights Act of 1964. Metro timely removed on the basis of federal-question jurisdiction. (Docket Entry No. 1). After discovery, Metro moved for summary judgment on all Edmund's claims. (Docket Entry No. 28). In response, Edmund, who is proceeding *pro se*, submitted a letter requesting the introduction of certain evidence at trial. (Docket Entry No. 29). This court gave Edmund an additional opportunity and time to respond to Metro's motion for summary judgment. (Docket Entry No. 30). Edmund filed a "Motion to Retain," which, liberally construed, asked this court to deny Metro's motion for summary judgment because he "fully intend[s] to retain the suit." (Docket Entry No. 31).

This court has carefully reviewed the pleadings, the motion and Edmund's responses, the record, and the applicable law, with the liberal approach due *pro se* submissions. Based on this

review, this court concludes that as a matter of law, the undisputed facts entitle Metro to judgment as a matter of law, and grants Metro's motion for summary judgment. Final judgment is entered by separate order. The reasons are explained in detail below.

**I.     Background**

Edmund began working for Metro as a bus operator in Houston, Texas on May 17, 2002. (Docket Entry No. 28, Ex. 1, Deposition of Romeo Edmund at 18:18-21). Edmund was for a time a member of the Transport Workers Union of America, Local 260 ("Union"). (*Id.*, at 41:12-15). As a bus operator and Metro employee, regardless of Union membership, Edmund was entitled to Union representation on matters concerning his employment. (*Id.*).

On January 2, 2005, Edmund was driving his bus route when he was robbed at gunpoint. (*Id.*, Ex. 8). He asserts that the robber shot at him, that Houston police recovered the "bullet shell,"and that the robber was subsequently convicted. (*Id.*). Edmund complained to Metro about the robbery and about bus-operator safety. (Docket Entry No. 28, Ex. 1, Edmund Deposition at 26:24-25). Edmund spoke with Frank Wilson, Metro's President and CEO, and was told that Wilson would look into the matter. (*Id.*, at 27:2-5). Edmund alleges that Metro "neglected [to install security cameras on buses] because most of the bus drivers are minorities." (*Id.*, at 138:19-23). He asserts that Metro ignored his complaints out of a desire to "cover their security breaches" and keep the robbery incident from media exposure. (*Id.*, at 135:14-17; Docket Entry No. 28, Ex. 8).

Edmund also told Robert Augustine, a Metro Superintendent, about the robbery. According to Edmund, Augustine told him that the robbery never happened. (Docket Entry No. 28, Ex. 1, Edmund Deposition, at 26:2-4). Yet Edmund also alleges that Augustine made "jokes and innuendos" about the robbery, such as "You got robbed, you got shot at. Tomorrow I'll see you, I'll

2

say 'Hey, by now, you could have been in hell.' So you are now here, or in hell, which do you prefer?" (*Id.*, at 91:1-4). Edmund asserts that Augustine was negligent in failing to tell him what to do or who to talk to about getting help for injuries resulting from the robbery. (*Id.*, at 128:20-129:8). Edmund asserts that he sustained a "bump on [his] left forehead," a "deep gash" on his right hand, and broken right toes. (Docket Entry No. 29).

On January 30, 2006, Carol Escobedo, Metro's claims adjuster, denied Edmund's worker's compensation claim. (Docket Entry No. 28, Ex. 8). Edmund alleges that Metro denied his claim "to cover up [their] security breaches and injuries [he] sustained." (*Id.*). According to Edmund, he currently walks with a limp, has regular chest and back pains, and suffers from "nightmares, bed-wetting, nervousness, psychological trauma, and emotional stress." (*Id.*). Edmund argues that Metro should have "gotten [him] help" and "made sure that [he] got medical attention." (Docket Entry No. 28, Ex. A, Edmund Deposition, at 131:24-25; 132:11-12).

Edmund alleges that he began to be harassed at work after the robbery. (*Id.*, at 70:7-12). Edmund asserts that street supervisors harassed him by asking him "Why is your uniform dirty?" when it was not in fact dirty. (*Id.*, at 68:18-24). Edmund asserts that he submitted several grievances to Augustine complaining that the street supervisors were rude and were writing him up for misconduct based on false information. The record contains evidence about two grievances. Edmund complained about "rude, biased, and unprofessional" behavior and "breaches of proper courtesy" by one street supervisor, Gary Baldwin. (*Id.*, at 81:22-82:6). Edmund also complained about another street supervisor, C. Jackson, after she suspended him for three days without pay when a glass window was broken on his bus during his route. (*Id.*, at 77:9-13). Edmund asserts that he filed these and other grievances to "clear his name" because he had not done anything wrong but

3

had still been "written-up."  According to Edmund, Augustine did not forward these grievances to the Union or to the appropriate parties.  (*Id.*, 70:24-71:1).

Edmund alleges that Augustine and the supervisors were part of a conspiracy to falsely accuse him of misconduct so that they could "get rid" of him in order to cover up security breaches on the buses.  (*Id.*, at 67:18-25; 134:2-25).  Edmund asserts that on one occasion, Augustine said, "Hey, what those union people do for you?"  (*Id.*, at 71:21-22).  Edmund asserts that this was "like a mockery, because of maybe of an incident that happened or maybe me telling him: 'You did not forward my request, Mr. Augustine.'"  (*Id.*, at 71:22-25).  Edmund asserts that Augustine used "reverse psychology" by asking questions like "What does the union really do for us?" and "Who is the Union? What do they even do there?"  (*Id.*, at 126:12-15).

Edmund also complains of "repeated racial insults and slurs" that occurred after the robbery. (Docket Entry No. 1).  In his deposition, he testified that when he was on the employee shuttle bus, his coworkers said things like "Oh, they would have . . . killed your African ass off" or "they could have almost got your Black African ass" and "foo-foo[1] motherfucker" and "easy motherfucker." (Docket Entry No. 28, Ex. A, Edmund Deposition at 91:24-92:6; 99:9-10; 100:16-22).  He alleges that street supervisors made similar comments while he was waiting for the shuttle bus.  (*Id.*, at 99:11-100:2).  In his deposition, Edmund testified that the comments by his coworkers and supervisors were "not like an everyday thing" and "seldom happen[ed]."  (*Id.*, at 103:2-4).

Edmund alleges that the conspiracy included a delay in granting his request for a leave of absence in early 2006 that made him miss his own wedding. (Docket Entry No. 28, Ex. 8).  Edmund

---

[1] Foofoo is a staple food of West and Central Africa.  It is a thick paste or porridge made from starchy vegetables.

asserts that he gave "decent notification" of his travel and wedding plans to his supervisors. (Docket Entry No. 29). Under the labor agreement between Metro and the Union, Metro "may, for reasons satisfactory to the Authority, grant personal leaves of absence without pay for a period not to exceed thirty 30 calendar days, provided there are other employees available and capable of doing the job." (Docket Entry No. 28, Ex. 3). Edmund does not state how much leave time he asked for or how far in advance he made the request. Edmund asserts that "[t]hey made sure my wedding was over with before they authorized my trip. I even had to pay extra $350.00 penalty on my travel ticket." (*Id.*). He complains that his brother had to stand in his place at the ceremony, which his "wife never forgave." (Docket Entry No. 28, Ex. 8). According to Edmund, Metro's delay in granting his leave request cost him his marriage. He complained to Frank Wilson who, according to Edmund, was "touched and disappointed," and said that he had missed his own wedding and would call Edmund. (*Id.*). In his deposition, Edmund testified that Wilson said these words "with a smirk on his face" and that Wilson is "not a man of his words" because he did not call as promised. (Docket Entry No. 28, Ex. 1, Edmund Deposition, at 122:13-16).

On August 16, 2006, Edmund learned that his father had died in Nigeria. (*Id.*, at 29:17-22). He asked for a leave of absence to attend the funeral. Edmund made travel arrangements in October 2006. He planned to leave for Lagos, Nigeria on November 19, 2006 and return to Houston on January 18, 2007. (*Id.*, at 33:16-23). Augustine granted Edmund a 30-day leave of absence from November 19, 2006 to December 20, 2006, consistent with Metro's 30-day leave limit. (*Id.*, at 35:22-36:1). Edmund asserts that Augustine did not grant him the leave until two days before the scheduled departure date and only after insisting that Edmund provide a copy of the death certificate and travel itinerary. (*Id.*, at 35:21-36:5).

5

On December 11, 2006, an "Employee Change Form" was initiated to terminate Edmund's employment for being absent without leave. (Docket Entry No. 28, Ex. 3, at 8). Edmund was still in Nigeria after December 20, 2006. The form was approved and signed on December 27, 2006. (*Id.*). Edmund called Augustine from Nigeria and was told about the firing. (Docket Entry No. 28, Ex. 1, Edmund Deposition, at 40:12-18). Edmund testified in his deposition that he did not understand from this phone conversation why Metro had fired him. (*Id.*). When Edmund attempted to return to work on January 19, 2007, he was told he had been terminated for being absent without leave. (*Id.*, at 40:1-8).

Edmund talked to Sandra Burleson, the Union's President, about seeking reinstatement. (*Id.*, at 41:5-11). After negotiation with the Union, Metro agreed to reinstate Edmund to his position as a bus operator. Under a Reinstatement Agreement dated January 26, 2007, (Docket Entry No. 28, Ex. 5), Edmund was reinstated with full seniority, without back pay, contingent on passing physical, drug, and alcohol testing. (*Id.*). The Agreement also included a termination clause stating that "[a]ny further infraction that would result in a disciplinary action which includes a reprimand or a suspension within the next 12 months from the date of this agreement will be grounds for immediate termination." (*Id.*). Edmund signed the Agreement on January 30, 2007. (*Id.*).

On April 16, 2007, Edmund was assigned to report to work at 4:25 a.m. (Docket Entry No. 28, Ex. 1, Edmund Deposition, at 47:6-7, 48:22). He arrived at 5:03 a.m. and explained that he had car trouble. (*Id.*). This was Edmund's fourth tardy or missed day of work in 12 months. (Docket Entry No. 28, Ex. D). Under Metro's Employee Performance Code, four tardies or missed work days within a 12-month period calls for a written reprimand. (*Id.*, Ex. 7). After Edmund received the written reprimand on April 16, 2007, Metro terminated his employment under the Reinstatement

6

Agreement. (*Id.*, Ex. 6). Edmund filed an EEOC charge on August 13, 2007 and this lawsuit on November 20, 2007. He alleges retaliation, discriminatory disparate treatment, and a hostile work environment.

## II.     The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See id*. The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.

## III.     Analysis

### A.     The Retaliation Claim

Metro moves for summary judgment on the retaliation claim asserted in this lawsuit because it was not included in Edmund's EEOC complaint. The EEOC complaint, filed on August 13, 2007, asserted as the discriminatory acts that during Edmund's employment at Metro, he "was subjected to constant harassment from Robert Augustine, Superintendent," and that he had been fired on April 16, 2007. (Docket Entry No. 28, Ex. 9). Edmund asserted that he had been "discriminated against because of [his] race, Black, and [his] national origin, Nigerian." (*Id.*). Edmund did not check the box for retaliation and the charge did not refer to retaliation or to any protected activity such as complaining about discriminatory treatment. In this lawsuit, Edmund includes a claim for retaliation for complaining about the robbery, for making a worker's compensation claim, and for requesting a leave of absence.

"The filing of an administrative complaint is a prerequisite to a Title VII suit."[2] *Thomas v. Atmos Energy Corp.*, 223 Fed. Appx. 369, 376 (5th Cir. 2007); *Harris v. Honda*, 213 Fed. Appx. 258, 261 (5th Cir. 2006); *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006). "A Title VII cause

---

[2] Fifth Circuit panels have disagreed over whether exhaustion is a jurisdictional requirement or simply a prerequisite to suit. *Pacheco*, 448 F.3d at 788 n. 7.

of action may be based, not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination." *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir. 1992); *Pacheco*, 448 F.3d at 789 (quoting *Fine* with approval). An EEOC charge must be filed within 300 days of the alleged discrimination. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

In determining whether an allegation in a complaint falls within the scope of an EEOC complaint, a court must "engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label." *Pacheco*, 448 F.3d at 789. This rule is designed to balance two competing policies. *Id.* at 788. On the one hand, this exhaustion requirement "serves the dual purposes of giving the employer some warning as to the conduct about which the employee is complaining and affording the EEOC and the employer an opportunity to settle the dispute through conciliation." *Benson v. Mary Kay Inc.*, No. 3:06-CV-1911-R, 2007 WL 1719927, at *1 n. 1 (N.D. Tex. June 11, 2007). On the other hand, "the provisions of Title VII were not designed for the sophisticated, and because most complaints are initiated *pro se*, the scope of an EEOC complaint should be construed liberally." *Pacheco*, 448 F.3d at 788 (quoting *Sanchez*, 448 F.3d at 463) (quotations omitted).

The Fifth Circuit has recently clarified its often-repeated directive to construe EEOC charges liberally, *see*, *e.g.*, *Clark v. Kraft Foods*, Inc., 18 F.3d 1278, 1280 n.7 (5th Cir. 1994); *Price v. Sw. Bell Tel. Co.*, 78 (5th Cir. 1982); *Terrell v. United States Pipe & Foundry Co.*, 644 F.2d 1112 (5th Cir. 1981). "[F]or the most part, the desired liberality is achieved by application of the rule that

courts will look beyond the scope of the charge's language to the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge." *Pacheco*, 448 F.3d at 789 n. 9.

In this case, the EEOC charge does not assert that Metro retaliated against Edmund for engaging in activity protected by Title VII. The charge does not mention that Edmund had made prior complaints to his supervisors about racial discrimination or that Edmund had engaged in any other activity protected by Title VII. Edmund's retaliation claims are not "like or related to the charge's allegations." *See Abraham v. Potter*, 494 F.Supp.2d 141, 151 (D. Conn. 2007) ("The scope of an EEOC investigation cannot reasonably be expected to encompass retaliation when [a plaintiff has] failed to put the agency on notice that []he had engaged in the type of protected activity that is the predicate to a retaliation claim.") (quoting *O'Hara v. Memorial Sloan-Kettering Cancer Center*, 27 Fed. App'x 69, 70 (2d Cir. 2001)); *Oramous v. Military Dep't of La.*, 2007 WL 2344921, at *2-3 (E.D. La. Aug. 15, 2007) (explaining that retaliation claim is not expected to grow out of an EEOC discrimination charge when the charge does not mention a complaint of discrimination, to whom the complaint was made, or what adverse action allegedly resulted from the complaint) (citing *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002)). There is no reason to believe that a retaliation claim would be uncovered by the EEOC's general investigation of Edmund's discrimination claim. Edmund's retaliation claim could not "reasonably be expected to grow" out of the investigation into his EEOC charge.[3]

---

[3] Although a retaliation claim need not be exhausted where the person complains of retaliation for filing the EEOC charge itself, *see Eberle v. Gonzales*, 240 Fed. Appx. 622, 628 (5th Cir. 2007), Edmund complains of retaliatory acts that preceded the filing of his EEOC charge. These acts do not fall within this exception. *See Hayes v. MBNA Technology, Inc.*, 2004 WL 1283965, at *9 (N.D. Tex. June 9, 2004). "Where the alleged retaliation occurs before the initial EEOC charge is filed, a plaintiff must exhaust [her] administrative remedies on that claim." *McCray v. DPC Indus., Inc.*, 942 F.Supp. 288, 295 (E.D.Tex. 1996).

Even assuming that the exhaustion requirement was met as to this claim, it fails as a matter of law. Title VII's antiretaliation provision covers two types of protected activity, making it "an unlawful employment practice for an employer to discriminate against any of his employees . . . [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see also Crawford v. Metropolitan Gov't of Nashville & Davidson County, Tenn.*, 129 S.Ct. 846, 849 (2009) (holding that "opposing" an unlawful employment practice includes responding to internal investigation questions posed by employer about another employee's harassment claim). The elements of a *prima facie* retaliation claim under Title VII are that: (1) the plaintiff engaged in an activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007). Edmund's complaints about the robbery incident, the fact that he filed a worker's compensation claim, and his request for a leave of absence, are not protected activity under Title VII. *See* 42 U.S.C. § 2000e-3(a). Edmund did not allege facts showing that he engaged in protected activity. The summary judgment record shows that the activity he identifies as the basis for the retaliation was not protected under Title VII as a matter of law. Summary judgment is granted as to this claim.

**B.     The Discrimination Claims: Disparate Treatment and Job Termination**

Edmund alleges that Metro discriminated against him based on his race and national origin. Edmund alleges that Augustine approved leave requests for other Metro employees to travel "at will," but delayed granting Edmund's request for leave to attend his wedding and did not grant the

leave request to attend his father's funeral until the "last minute." (Docket Entry No. 28, Ex. 8). Edmund also alleges that Metro discriminated against him by terminating his employment.

Title VII prohibits discrimination by employers "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a). Intentional discrimination can be proven by either direct or circumstantial evidence. *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir. 2000). Evidence is "direct" if it would prove the fact in question without inference or presumption. *Fabela v. Socorro Indep. Sch. Dist.,* 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted). If no direct evidence exists, the court uses the familiar burden-shifting framework created by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under *McDonnell Douglas,* a plaintiff alleging discrimination must first present a *prima facie* case by showing that (1) he is a member of a protected class; (2) he was qualified for the position; (3) others similarly situated were treated more favorably. *See id.*; *Septimus v. Univ. of Houston,* 399 F.3d 601, 609 (5th Cir. 2005). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the challenged action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the defendant meets this burden, the plaintiff must then create a genuine issue of material fact that either (1) the defendant's reason is not true, but is instead a pretext for discrimination; or (2) the defendant's reason, while true, is only one of the reasons for its conduct and that discrimination was a motivating factor in the defendant's decision. *See Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004); *see generally, Crawford v. U.S. Dept. of Homeland §.*, 245 Fed. App'x 369, 377-378 (5th Cir. 2007). The plaintiff

12

can meet this burden "by producing circumstantial evidence sufficient to create a fact issue as to whether the employer's nondiscriminatory reasons are merely pretext for discrimination." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005). The United States Supreme Court, in *Reeves v. Sanderson Plumbing Prods.,* stated that "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." 530 U.S. 133, 143 (2000).

Metro does not dispute that Edmund is a member of a protected class or that he was qualified for the position. Metro argues that Edmund cannot show that other similarly situated bus operators were treated more favorably.

With respect to the alleged disparate treatment for leave requests, Edmund asserts that Augustine and Metro allowed other employees in his "category of work" to "travel at will" while he was "repeatedly denied access to travel even after ticket purchase." (Docket Entry No. 28, Ex.8). In his deposition, Edmund testified that "there are people that have been in under the circumstances at will, maybe family death" who were granted leave to travel. (Docket Entry No. 28, Ex. 1, Edmund Deposition at 62:4-6). Edmund identifies two instances: the authorization to travel for his wedding was delayed until it was too late to attend and he was denied the request for 60 days of leave to attend his father's funeral.

Edmund has not presented or identified evidence in the summary judgment record that similarly situated, non-African-American Metro bus operators were treated differently. There is no evidence in the record about when Edmund requested leave to attend his wedding, how much time he wanted to take off, or when Metro "authorized" his trip. Edmund has not identified any individuals who were granted leave requests to travel "at will." The record shows that he asked for

60 days of leave for his father's funeral, but Metro's policy limits leave to 30 days. The summary judgment evidence does not show that other Metro employees were granted a leave request of more than 30 days. Nor does the summary judgment evidence show that Metro's policy was to allow its employees to take more than 30 days of leave to attend a family member's funeral. Edmund could not provide the names of any such individuals at his deposition. (Docket Entry No. 28, Ex. 1, Edmund Deposition, at 62:20-63:7). Edmund "cannot defeat summary judgment [on his disparate treatment claim] with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation omitted); *see also Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 171 (6th Cir. 1996) (affirming the district court's grant of summary judgment where the plaintiffs' evidence contained numerous allegations of disparate treatment "that [were] made in general, conclusory terms, but names, times and occasions [were] missing"); *Smith v. Potter*, No. H-06-3278, 2008 WL 154462, at *5 (S.D. Tex. Jan. 15, 2008) (granting summary judgment on Title VII and ADEA claims because plaintiff's conclusory allegation that similarly situated employees existed was not supported by any evidence in the record); *Jackson v. Dallas County Juvenile Probation Dep't*, No. 3:06-CV-264-M, 2007 WL 2187250, at *7 (N.D. Tex. July 30, 2007) (granting summary judgment on Title VII claim where plaintiff failed to present evidence of similarly situated employees outside the protected class who were treated more favorably and only offered conclusory allegations of disparate treatment).

With respect to his job termination claim, it is undisputed that Edmund was fired after he was over a half-hour late for work. It is also undisputed that this was the fourth time he was late or missed work in a twelve-month period. It is also undisputed that under the Reinstatement Agreement, this was grounds for firing.

In disparate treatment cases involving employee misconduct and discipline, a "plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees." *Okoye v. Univ. of Texas Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001) (internal quotations omitted); *see also Berquist v. Wash. Mut. Bank*, No. 05-20956, 2007 WL 2007333, at *7 (5th Cir. Jul.12, 2007) ("In disparate treatment cases, the plaintiff-employee must show 'nearly identical' circumstances for the employees to be considered similarly situated."); *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) ("Or put another way, the conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer."). The record does not show any non-African-American Metro employee who had a similar record and was subject to a Reinstatement Agreement who was not fired. Edmund's claim that Metro racially discriminated against him by terminating his employment fails as a matter of law.

Even assuming that Edmund could establish a *prima facie* case of discrimination based on his termination, Metro has offered a legitimate nondiscriminatory reason for its decision and Edmund has not raised a fact issue material to determining pretext or discrimination. Metro terminated Edmund's employment on April 16, 2007 because he arrived late to work for the fourth time in twelve months, which called for a reprimand under Metro's Employee Performance Code and Work Rules. The termination clause of the Reinstatement Agreement stated that if Edmund received a reprimand, he would be terminated. The record does not raise a fact issue as to pretext or as to discriminatory motive. Metro's motion for summary judgment on Edmund's disparate

job treatment and termination claims is granted.

### C.    The Racially Hostile Work Environment Claim

Edmund's hostile work environment claim is based on Augustine's questions about what the Union had done for Edmund, the street supervisors' statements about Edmund's uniform being dirty, and the statements by coworkers and street supervisors calling Edmund a "foo-foo motherfucker" and "easy motherfucker" and saying that the robber could have "killed his African ass off." Edmund's claim is also based on "unfounded complaints made by [Edmund's] supervisors concerning [his] work" and the assignment to "perform demeaning duties (driving the same route he got shot on)." (Docket Entry No. 1). Metro argues that Edmund's own allegations and testimony show that as a matter of law, the alleged comments and conduct were not sufficiently severe or pervasive to create a hostile work environment.

The elements of a hostile work environment claim are that: (1) the plaintiff belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known of the harassment, yet failed to take prompt remedial action. *Felton v. Polles,* 315 F.3d 470, 484 (5th Cir.2002). The fifth element is not required when the alleged harasser is a supervisor with immediate or successively higher authority over the plaintiff. *See Celestine,* 266 F.3d at 353-54 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

The Supreme Court has explained that in determining whether workplace conditions are a hostile work environment, courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

16

whether it unreasonably interferes with the employee's work performance." *Harris,* 510 U.S. at 23. For harassment to be actionable, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks and citation omitted); *Watkins v. Texas Dept. of Criminal Justice*, 269 Fed. App'x 457, 463-464 (5th Cir. 2008). "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill v. Westward Communications LLC*, 433 F.3d 428, 434 (5th Cir. 2005) (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)). The Supreme Court has made clear "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). The evidence, taken in the light most favorable to Edmund, does not show comments or conduct that is so offensive or frequent as to give rise to a racially hostile work environment claim. Many of the comments Edmund testified to are about the Union and are not racially offensive in nature. *See Vallecillo v. U.S. Dep't of Housing and Urban Dev.*, 155 Fed. App'x 764, 767 (5th Cir. 2005) (affirming summary judgment on a hostile work environment claim when the complained-of harassment was not based on the plaintiff's race or national origin). Edmund testified that the comments were infrequent. (Docket Entry No. 28, Ex. A, Edmund Deposition, at 103:2-4). Title VII "was only meant to bar conduct that is so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace." Conduct that "sporadically wounds or offends but does not hinder [an] employee's performance" is not actionable. *Weller v. Citation Oil & Gas*

*Corp.*, 84 F.3d 191, 194 (5th Cir. 1996); *see also Shepard v. Comptroller Public of Accounts*, 168 F.3d 871, 874 (5th Cir. 1999). It is a "demanding" standard that requires proof of severe or pervasive conduct that can be characterized as "extreme." *Faragher*, 524 U.S. at 788.

The case law on when workplace comments give rise to a hostile work environment claim shows a far greater degree of harassment than the record discloses here, both in terms of the frequency and the nature of the offensive communications. *Compare Tademy v. Union Pacific Corp.*, 520 F.3d 1149, 1162 (10th Cir. 2008) (evidence of offensive graffiti and cartoons and the words "nigger," "nigger go home," and "hang all niggers and jews" etched on the employee's locker and a life-sized noose hanging in the workplace); *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (a male employee was called "faggot" and "female whore" by coworkers and supervisors weekly and often several times a day); *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 817 (9th Cir. 2002) (verbal and physical abuse daily for nearly four years because of race); *Walker v. Thompson*, 214 F.3d 615, 619-22 (5th Cir. 2000) (years of inflammatory racial epithets, including "nigger" and "little black monkey"); *with Baker v. FedEx Ground Package System, Inc.*, 278 Fed. App'x 322, 329 (5th Cir. 2008) (*s*upervisor's comments to African-American employee that "she did not want to work with people like" employee and that "whites rule" did not show a race-based hostile work environment*); Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (a supervisor's infrequent and isolated comments directed to the plaintiff about "ghetto children" and other racially insensitive remarks did not rise to the level of severe or pervasive harassment); *Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir. 2005) (a two-hour "harangue" by a supervisor and his use of a mocking tone on one occasion, and another supervisor's comment comparing the plaintiff to a "needy old girlfriend," were not severe or pervasive and did

not amount to a hostile working environment); *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (occasional racial comments were insufficient for a hostile work environment claim).

The record does not show that the conduct or comments Edmund complains of was "sufficiently severe or pervasive as to alter the conditions of [his] employment and create an abusive working environment." Edmund's testimony that he received excessive or unfounded "write ups," even when combined with the offensive comments, does not give rise to a fact issue as to a hostile work environment. *See*, *e.g.*, *Ellis v. Principi*, 246 Fed. App'x 867, 871 (5th Cir. 2007) (finding that a plaintiff did not suffer a hostile work environment based on evidence that the supervisor gave her less favorable work assignments than her coworkers, denied her a performance award, and required her to use leave time to compensate for arriving late to work, and that coworkers made comments about the plaintiff's religion and referred to her as "Mother Theresa"); *Harrington v. Disney Reg'l Entm't, Inc.*, No. 06-12226, 2007 WL 3036873, at *12 (11th Cir. Oct. 19, 2007) (unpublished) (finding no hostile environment when an employer allegedly subjected the employee to unfair discipline); *Schultze v. White*, 127 Fed. Appx. 212, 217-18 (7th Cir. 2005) (unpublished) (plaintiff in sex harassment case did not show she was subject to hostile work environment despite evidence of heightened monitoring and close scrutiny of her job performance, sexually derogatory comments, and unequal discipline based on sex); *Hegyes v. U.S. Steel Corp.*, 2007 WL 218711, at *17 (W.D. Pa. Jan. 25, 2007) (finding no hostile work environment in case involving "unfounded discipline" and "yelling, swearing and finger-pointing").

Metro's motion for summary judgment on Edmund's hostile work environment claim is granted.

**IV. Conclusion**

Metro's motion for summary judgment is granted. Final judgment is entered by separate order.

SIGNED on February 23, 2009, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge